[Cite as *State v. Panaro*, 2018-Ohio-1005.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

| | | |
|---|---|---|
| STATE OF OHIO | | C.A. No. 16CA0067-M |
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| JASON PANARO | | MEDINA MUNICIPAL COURT COUNTY OF MEDINA, OHIO |
| Appellant | | CASE No. 15 TRC05262 |

DECISION AND JOURNAL ENTRY

Dated: March 19, 2018

CARR, Presiding Judge.

{¶1} Defendant-Appellant Jason Panaro appeals from the judgment of the Medina Municipal Court. This Court affirms.

I.

{¶2} On July 30, 2015, around 1 a.m., Officer Matthew Sandella of the Brunswick Hills Police Department stopped a vehicle driven by Panaro. Following the administration of field sobriety tests, Panaro was arrested and transported to the police station where breathalyzer testing was conducted. A complaint was filed, alleging that Panaro violated R.C. 4511.19(A)(1)(a), R.C. 4511.19(A)(1)(h), and R.C. 4511.39.

{¶3} Panaro filed a motion to suppress arguing, inter alia, that the officer lacked reasonable suspicion to stop Panaro's vehicle, the officer lacked reasonable suspicion to further detain Panaro in order to conduct field sobriety testing, and that the field sobriety tests were not conducted in substantial compliance with standardized procedures. Following a hearing on the

motion to suppress, the trial court ordered the suppression of the results of two of the field sobriety tests, but otherwise denied the motion to suppress.

{¶4} Panaro pleaded no contest to one count of violating R.C. 4511.19(A)(1)(a) and the judgment entry reflects the remaining counts were dismissed. Panaro was thereafter sentenced and has appealed, raising two assignments of error for our review.

II.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT'S FINDING THAT OFFICER SANDELLA OBSERVED APPELLANT FAIL TO USE HIS TURN SIGNAL AT LEAST 100' BEFORE TURNING LEFT ONTO GRAFTON ROAD IS NOT SUPPORTED BY COMPETENT, CREDIBLE EVIDENCE. THE OFFICER'S DASH CAM VIDEO SHOW THAT MR. PANARO HAD HIS TURN SIGNAL ON AT LEAST 100' BEFORE TURNING ONTO GRAFTON ROAD, AND THEREFORE DID NOT VIOLATE []R.C. []4511.39.

{¶5} Panaro argues in his first assignment of error that the trial court erred in concluding that he failed to use his turn signal on two occasions. First, Panaro asserts that the trial court's finding that Panaro failed to use his turn signal before moving into the turn lane is not supported by the evidence. Second, Panaro argues that the trial court erred in concluding that Panaro failed to put his turn signal on 100 feet prior to turning. Panaro only appears to challenge the trial court's factual findings, not the trial court's application of the law to the facts. Thus, he appears to concede that if either of the trial court's findings is supported by the record, the trial court did not err in finding the officer possessed reasonable suspicion to stop the vehicle.

{¶6} A motion to suppress evidence presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id*., citing *State v. Mills*, 62 Ohio

St.3d 357, 366 (1992). Thus, a reviewing court "must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8. "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id*., citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

{¶7} "The Fourth Amendment to the United States Constitution and Section 14, Article 1 of the Ohio Constitution proscribe unreasonable searches and seizures. To justify an investigative stop, an officer must point to 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *State v. Kordich,* 9th Dist. Medina No. 15CA0058-M, 2017-Ohio-234, ¶ 7, quoting *Maumee v. Weisner*, 87 Ohio St.3d 295, 299 (1999), quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968). "In evaluating the facts and inferences supporting the stop, a court must consider the totality of the circumstances as 'viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.'" *Kordich* at ¶ 7, quoting *State v. Bobo*, 37 Ohio St.3d 177, 179 (1988). "This Court has repeatedly recognized that '[a]n officer may stop a vehicle to investigate a suspected violation of a traffic law.'" *Kordich* at ¶ 7, quoting *State v. Slates*, 9th Dist. Summit No. 25019, 2011-Ohio-295, ¶ 23. "Where an officer has an articulable reasonable suspicion or probable cause to stop a motorist for any criminal violation, including a minor traffic violation, the stop is constitutionally valid[.]" (Internal quotations and citations omitted.) *State v. Freeman*, 9th Dist. Summit No. 27617, 2015-Ohio-2501, ¶ 10.

{¶8} R.C. 4511.39(A) provides in relevant part:

No person shall turn a vehicle or trackless trolley or move right or left upon a highway unless and until such person has exercised due care to ascertain that the movement can be made with reasonable safety nor without giving an appropriate signal in the manner hereinafter provided.

When required, a signal of intention to turn or move right or left shall be given continuously during not less than the last one hundred feet traveled by the vehicle or trackless trolley before turning * * *.

{¶9} Officer Sandella was the only witness to testify at the suppression hearing; however, a DVD containing the footage from the cruiser's dash cam was admitted into evidence. Around 1 a.m. on July 30, 2015, Officer Sandella, who was on patrol, was sitting in his marked police cruiser, which was parked on the property of a business on Pearl Road, observing traffic. Officer Sandella noticed a vehicle leaving the Dance Saloon; he would later determine that Panaro was the driver of that vehicle. Prior to Panaro's vehicle entering the roadway, another vehicle passed Officer Sandella and that vehicle briefly followed Panaro's vehicle. Officer Sandella then pulled out, as he decided to follow Panaro's vehicle.

{¶10} Officer Sandella testified that he noticed Panaro's vehicle enter the turn lane without using a turn signal and also observed that the vehicle did not have a turn signal on for at least 100 feet prior to turning left at the intersection of Pearl and Grafton Roads. Officer Sandella clarified on cross-examination that it was not until right before Panaro turned into the intersection that he put on his turn signal and that he came almost to a complete stop before entering the intersection. Officer Sandella asserted that, even if the turn signal was on for several seconds, given Panaro's slow speed at the time, the turn signal still was not on for 100 feet prior to the turn. Officer Sandella did not observe any further violations.

{¶11} From the DVD, one can see Panaro's vehicle exiting a driveway and turning on to Pearl Road. Prior to Panaro's vehicle entering the roadway, another vehicle passes Officer Sandella's cruiser and briefly follows Panaro's vehicle. Then Officer Sandella pulls out on to Pearl Road and it becomes briefly somewhat difficult to see Panaro's vehicle due to the movement of the cruiser, the distance, the vehicle behind Panaro, and the darkness. However, to

the extent Panaro's vehicle can be seen in the process of changing lanes, it does not appear from the video that Panaro uses his turn signal. While Panaro does clearly use his turn signal prior to turning left on Grafton Road, it is not clear from the video at what distance Panaro activates his turn signal.

{¶12}  The trial court found that Officer Sandella testified that he observed Panaro enter the left turn lane without using a turn signal and also testified that he observed that Panaro failed to use his turn signal 100 feet before turning left. In addition, the trial court viewed the dash cam video and concluded "[i]t [was]clear that [Panaro did] not use his turn signal before moving his car into the center lane or dedicated left turn lane[]" and that Panaro had his turn signal on for about 4 seconds but "it is unclear how far from the intersection the Defendant [was] when the turn signal [was] operated." Ultimately, the trial court concluded in its judgment entry, "that the traffic violation involving the failure to properly use a turn signal when changing lanes as shown in the dash cam video and the failure to properly use a turn signal 100 feet prior to making a left hand turn as observed by the officer created a reasonable, articulable suspicions and/or probable cause for the initial detention of Defendant's vehicle."

{¶13}  From viewing the video alone, this Court cannot say whether Panaro used his turn signal *prior* to moving into the turn lane, although from what can be seen, it does not appear that Panaro used his turn signal *while in the process of* changing lanes. Thus, the trial court's statement that the video "[was] clear that [Panaro did] not use his turn signal *before* moving his car into the center lane or dedicated left turn lane[]" is somewhat troubling. (Emphasis added.) However, even assuming that particular factual finding is not supported by the record, given the Officer's testimony (which the trial court clearly found credible), and the video which evidences Panaro not using his turn signal while changing lanes, Panaro has not explained how the trial

court's conclusion that Panaro failed to properly use his turn signal when changing lanes is unsupported by the record. *See* App.R. 16(A)(7). It is not this Court's duty to develop an argument for him. *See Cardone v. Cardone*, 9th Dist. Summit Nos. 18349, 18673, 1998 Ohio App. LEXIS 2028, *22 (May 6, 1998). The video does not contradict the officer's testimony and it would not be unreasonable for the trial court to believe that the police officer's view of the events was at least somewhat different than that captured by the video given the circumstances.

{¶14} Nonetheless, even assuming this precise finding was not supported by competent, credible evidence, the trial court's finding that Panaro failed to use his turn signal for 100 feet prior to turning left was supported by competent, credible evidence. *See State v. Bramley*, 9th Dist. Medina No. 17CA0033-M, 2017-Ohio-8512, ¶ 15. From the video, it is impossible to tell how far Panaro was from the intersection when he activated his turn signal. Officer Sandella, however, did testify that while Panaro did use his turn signal when turning, he failed to use it 100 feet prior to turning. The officer further testified that it was not until Panaro was nearly at the intersection that he utilized his turn signal. It is clear that the trial court found Officer Sandella's testimony credible, as the trial court relied on it. As the video does not discredit Officer Sandella's testimony, we cannot say that the trial court's finding is unsupported by the evidence. *See Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, at ¶ 8.

{¶15} Panaro has not contested that if he indeed failed to use his turn signal 100 feet prior to turning left he would have violated the statute. Given that a single suspected traffic violation provides reasonable suspicion for an officer to stop a vehicle, Panaro has not demonstrated that the initial stop violated the constitution. *See State v. Freeman*, 2015-Ohio-2501, at ¶ 10; *Kordich*, 2017-Ohio-234, at ¶ 7.

{¶16} Panaro's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN CONCLUDING THAT THERE WERE SUFFICIENT SPECIFIC, ARTICULABLE FACTS CREATING REASONABLE SUSPICION OF OPERATING A VEHICLE UNDER THE INFLUENCE OF ALCOHOL TO JUSTIFY OFFICER SANDELLA'S CONTINUED DETENTION OF THE DRIVER BEYOND THE SCOPE OF THE INITIAL STOP TO PERFORM FIELD SOBRIETY TESTS[.]

{¶17} Panaro argues in his second assignment of error that the trial court erred in concluding that the officer possessed the reasonable, articulable suspicion needed to detain Panaro in order to perform field sobriety tests.

{¶18} "'[A] police officer does not need probable cause to conduct a field sobriety test; rather, he must simply have a reasonable suspicion of criminal activity.'" *State v. High*, 9th Dist. Medina No. 17CA0019-M, 2017-Ohio-8264, ¶ 8, quoting *Slates*, 2011-Ohio-295, at ¶ 24. "[R]easonable suspicion exists if an officer can point to specific and articulable facts indicating that [an individual] may be committing a criminal act." (Internal quotations and citations omitted.) *High* at ¶ 8. The totality of the circumstances is considered when determining whether reasonable suspicion exists. *See id.*

{¶19} After following Panaro for a short time after the turn, Officer Sandella activated his overhead lights. It took Panaro "a little while" to stop, which from the video appears to be approximately 45 seconds. Ultimately, Panaro turned right, without using his turn signal, onto a side street and pulled over. Officer Sandella testified that he asked for Panaro's driver's license and proof of insurance. While Panaro handed over his license, Officer Sandella had to remind Panaro about his insurance card. Officer Sandella detected "an odor of alcohol coming from within the vehicle[.]" Officer Sandella asked Panaro where he was coming from and he replied that he was coming from down the road. Officer Sandella asked him to be more specific and Panaro indicated "the bar[.]" When Officer Sandella asked which bar, Panaro could not

remember and stated it was "the titty bar." Officer Sandella asked whether it was the Dance Saloon and Panaro only agreed that it was when Officer Sandella asked whether it was the one with bikini dancers.

**{¶20}** Officer Sandella asked Panaro how much he had to drink and Panaro indicated he had a couple beers. When asked for specifics, Panaro responded that he had three Miller Lites. At that point, Officer Sandella returned to his cruiser, requested assistance, and then had Panaro exit the vehicle to perform field sobriety testing.

**{¶21}** Ultimately, the trial court concluded that Officer Sandella possessed reasonable suspicion of criminal activity authorizing him to further detain Panaro in order to conduct field sobriety testing. The trial court pointed to Panaro's failure to twice properly use a turn signal in a short span of time, the length of time it took Panaro to pull over, the "moderate" odor of alcohol coming from Panaro, and Panaro's admission to alcohol consumption.

**{¶22}** Panaro is correct that there was no testimony that there was a "moderate" odor of alcohol coming from Panaro's person. Instead, Officer Sandella's testimony was that there was "an odor of alcohol coming from within the vehicle." The intensity of that odor was not further specified. Nonetheless, even absent this finding, we conclude that, based upon the findings the trial court did make that are supported by the record, the trial court did not err in concluding that Officer Sandella possessed reasonable suspicion to further detain Panaro.

**{¶23}** Here, Panaro was leaving from a bar during the early morning hours after admittedly consuming three beers. In addition, it took him almost a minute to pull over after the officer turned on his overhead lights and he also displayed behavior that could be associated with memory impairment (having difficulty remembering where he was coming from and needing to

be asked to provide insurance information twice). Once he was stopped, the officer noticed an odor of alcohol emanating from the vehicle.

**{¶24}** This Court has previously concluded that "[t]he combination of Defendant's bloodshot eyes, a smell of alcohol, and his admission that he had consumed two beers was sufficient to provide [the officer] with reasonable suspicion to detain Defendant to investigate a possible violation of Ohio's laws prohibiting the operation of a motor vehicle while under the influence of alcohol." *State v. Tomko*, 9th Dist. Summit No. 19253, 1999 Ohio App. LEXIS 5133, *8-9 (Nov.3, 1999); *see also High*, 2017-Ohio-8264, at ¶ 14 ("This Court has held that even a mild odor of alcohol can provide reasonable suspicion for field sobriety testing when paired with other factors such as a traffic infraction, bloodshot eyes, and an admission to having consumed two beers."). While here there was no testimony that Panaro had bloodshot eyes, this Court has noted that other factors can be important, including the late hour, *Slates*, 2011-Ohio-295, at ¶ 25, location, and police officer's observations. *See State v. Rogers*, 9th Dist. Summit No. 26877, 2014-Ohio-103, ¶ 13. Considering the totality of the circumstances, we cannot conclude that the trial court erred in concluding that Officer Sandella possessed reasonable suspicion to further detain Panaro.

**{¶25}** Panaro's second assignment of error is overruled.

### III.

**{¶26}** Panaro's assignments of error are overruled. The judgment of the Medina Municipal Court is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Medina Municipal Court, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

 

DONNA J. CARR
FOR THE COURT


TEODOSIO, J.
CALLAHAN, J.
CONCUR.


APPEARANCES:

DAVID C. SHELDON, Attorney at Law, for Appellant.

GREGORY HUBER, J. MATTHEW LANIER, JOHN G. QUILLIN, and MEGAN A. PHILBIN, Proescuting Attorneys, for Appellee.