[Cite as *State v. Kelly*, 2025-Ohio-1689.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

STATE OF OHIO                 C.A. No.      2024CA0062-M

     Appellee

     v.                               APPEAL FROM JUDGMENT
                                        ENTERED IN THE
MATTHEW O. KELLY             MEDINA MUNICIPAL COURT
                                        COUNTY OF MEDINA, OHIO
     Appellant                    CASE No.      23TRC05686

DECISION AND JOURNAL ENTRY

Dated: May 12, 2025

---

SUTTON, Judge.

{¶1} Defendant-Appellant, Matthew Kelly, appeals from the judgment of the Medina Municipal Court. This Court affirms.

I.

{¶2} This appeal stems from a traffic stop that occurred just after 11:00 p.m. on a Friday night. Sergeant John Nemastil was driving southbound on Interstate 71 when he observed a lone vehicle speeding on the northbound side. He determined that the vehicle was traveling at speeds of up to 94 m.p.h. in the 70-m.p.h. zone. After the vehicle passed him, Sergeant Nemastil used the nearest median crossover to enter the northbound side of the highway and began his pursuit. He briefly lost sight of the vehicle as it crested a hill but otherwise maintained visual contact. When he crested the hill, he saw the vehicle pass two other vehicles and determined that it was traveling at speeds between 82 and 85 m.p.h. Sergeant Nemastil stopped the vehicle for speeding.

{¶3}    The vehicle contained two occupants: Mr. Kelly, who was the driver, and his wife, who was his passenger.  While speaking with the couple, Sergeant Nemastil detected an odor of alcohol.  He also noticed several indicators of impairment while watching Mr. Kelly.  The sergeant had Mr. Kelly exit the vehicle and perform field sobriety tests.  Based on all his observations and the results of the tests, Sergeant Nemastil arrested Mr. Kelly.  He transported him to the police station and administered a breathalyzer test.  The results of the test showed Mr. Kelly had a blood alcohol content ("BAC") of .175.

{¶4}    Mr. Kelly was charged with operating a vehicle under the influence of alcohol ("OVI"), OVI with a prohibited BAC, and speeding.  He filed a motion to suppress, and the trial court held a hearing on his motion.  After the court denied his motion, Mr. Kelly pleaded no contest.  The court merged his OVI counts as allied offenses.  It sentenced Mr. Kelly on his charges of OVI with a prohibited BAC and speeding.

{¶5}    Mr. Kelly now appeals from the trial court's judgment and raises three assignments of error for review.  Because all three assignments of error stem from the court's denial of his motion to suppress, we consolidate them for ease of review.

II.

**ASSIGNMENT OF ERROR I**

**THE TRIAL COURT ERRED IN GRANTING OVERRULING (sic) [MR. KELLY'S] MOTION TO SUPPRESS EVIDENCE WHERE THE EVIDENCE SHOWED THE TROOPER STOPPED THE WRONG VEHICLE FOR SPEEDING.**

**ASSIGNMENT OF ERROR II**

**THE TRIAL COURT ERRED IN DENYING [MR. KELLY'S] MOTION TO SUPPRESS EVIDENCE WHERE THE ARRESTING OFFICER LACKED REASONABLE, ARTICULABLE SUSPICION TO DETAIN [MR. KELLY] TO PERFORM STANDARDIZED FIELD SOBRIETY TESTS.**

**ASSIGNMENT OF ERROR III**

**THE TRIAL COURT ERRED IN DENYING [MR. KELLY'S] MOTION TO SUPPRESS WHERE THE TROOPER LACKED PROBABLE CAUSE TO ARREST [MR. KELLY.]**

**{¶6}** In each of his assignments of error, Mr. Kelly argues the trial court erred by denying his motion to suppress. He argues that Trooper Nemastil lacked reasonable suspicion to stop his vehicle, lacked reasonable suspicion to detain him for field sobriety testing, and lacked probable cause to arrest. For the following reasons, we overrule his assignments of error.

**{¶7}** A motion to suppress evidence presents a mixed question of law and fact. *State v. Burnside*, 2003-Ohio-5372, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). Thus, a reviewing court "must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8. "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist. 1997).

Traffic Stop

**{¶8}** "It is well-established that a police officer who observes a traffic violation possesses reasonable suspicion to conduct an investigatory stop." *State v. Jackson*, 2015-Ohio-2473, ¶ 15 (9th Dist.). "This includes stopping a vehicle for speeding." *State v. Snowberger*, 2022-Ohio-279, ¶ 7 (9th Dist.).

**{¶9}** The trial court made each of the following, relevant factual findings. Sergeant Nemastil was traveling southbound on Interstate 71 when he first spotted Mr. Kelly's vehicle. It

was around 11:00 p.m. on a Friday night, the weather was clear, and traffic conditions were light. The highway in that area was three lanes in each direction and had a posted speed limit of 70 m.p.h. Sergeant Nemastil noticed Mr. Kelly's vehicle when it was about 3/10 of a mile away. The vehicle was in the northbound lanes traveling toward him. Sergeant Nemastil's radar clocked the vehicle at speeds of 90, 93, and 94 m.p.h. in a lit area where no other cars were present. He was able to recognize the make of the vehicle (Acura) as well as its type (sports utility). After the vehicle passed by, Sergeant Nemastil used the nearest crossover to turn onto the northbound side of the highway. He reached speeds of 130 m.p.h. as he raced to catch up to Mr. Kelly's vehicle. When he was sufficiently close, his radar clocked the vehicle at speeds between 82 and 85 m.p.h. The only other vehicles he saw on the highway while pursuing Mr. Kelly were a commercial bus and a white vehicle, both of which Mr. Kelly passed. The trial court found that Sergeant Nemastil had reasonable suspicion to stop Mr. Kelly for speeding based on his observations, the radar readings, and a lack of evidence that the sergeant had stopped the wrong vehicle.

{¶10} Mr. Kelly challenges the trial court's factual findings as well as its legal conclusion. According to Mr. Kelly, the dashcam footage showed it was dark, not lit in the area where the speeding vehicle passed Sergeant Nemastil. He argues that it would have been impossible for the sergeant to recognize the make or model of the vehicle given the lighting conditions and its speed. He also argues that the evidence showed Sergeant Nemastil lost sight of the speeding vehicle for at least seven seconds during his pursuit. When Sergeant Nemastil crested the hill and approached his vehicle, Mr. Kelly argues, he did not pace it for at least one full mile per Ohio State Highway Patrol policy. Although the sergeant testified that he used his radar at that time, Mr. Kelly argues his testimony was questionable given that he did not mention using the radar at that time in his narrative report. According to Mr. Kelly, the weight of the evidence did not support the court's

finding that it was his vehicle rather than some other vehicle that Sergeant Nemastil saw speeding. Thus, he argues the sergeant lacked reasonable suspicion to stop his vehicle.

{¶11} Upon review, we must conclude that the trial court's findings are supported by competent, credible evidence. *See Burnside*, 2003-Ohio-5372, at ¶ 8. The trial court did not find that the entirety of Interstate 71 was lit or that it was lit in the area where the speeding vehicle passed Sergeant Nemastil. The court found the highway was lit in the area where the sergeant clocked the speeding vehicle at 90-94 m.p.h. Sergeant Nemastil testified that he was able to see Mr. Kelly's vehicle in a lit area as it crossed over the bridge for Interstate 271. He testified that the vehicle was in that area when he used his radar to clock it traveling between 90 and 94 m.p.h. The vehicle then entered a dark area as it left the bridge and passed him. The dashcam footage captured a vehicle traveling northbound in a lit area before crossing into a dark area and passing Sergeant Nemastil on the opposite side of the highway. Thus, the footage did not negate the sergeant's testimony.

{¶12} Insofar as Mr. Kelly challenges the weight of the evidence in support of the trial court's findings, the record does not reflect that the court lost its way. The dashcam footage showed the speeding vehicle upon its approach and, after the sergeant turned onto Interstate 71 north, it showed the vehicle's back taillights in the distance. The taillights remained in view the entire time, except for a period of seconds when the vehicle dropped below a crest in the road. There were no other cars traveling northbound on the road until Sergeant Nemastil made his approach. Around that time, the dashcam footage showed Mr. Kelly's vehicle passing two other vehicles. Sergeant Nemastil testified that he visually estimated the vehicle was speeding and his radar confirmed that was the case. Although he did not pace the vehicle for a full mile before he estimated its speed, he testified that the Ohio State Highway Patrol did not have a "black-and-

white" rule about doing so. Mr. Kelly did not introduce any policies to contravene that testimony. The sergeant insisted that he had a wealth of knowledge about vehicles and that Mr. Kelly's vehicle was the same one he saw speeding over the bridge. The trial court was best equipped to evaluate his credibility and resolve any questions of fact. *See State v. Nesbitt*, 2025-Ohio-223, ¶ 6 (9th Dist.).

{¶13} Accepting the trial court's findings as true, we cannot conclude that the court erred when it rejected Mr. Kelly's challenge to his initial traffic stop. *See Burnside* at ¶ 8. A speeding violation gives rise to reasonable suspicion to stop a vehicle. *Snowberger*, 2022-Ohio-279, at ¶ 7. Because Sergeant Nemastil saw Mr. Kelly speeding, he had reasonable suspicion to stop him. Mr. Kelly's first assignment of error is overruled.

Field Sobriety Testing

{¶14} An officer may extend an investigatory stop to conduct field sobriety testing if he develops a reasonable suspicion of additional criminal activity. *State v. Hochstetler*, 2016-Ohio-8389, ¶ 10 (9th Dist.). *See also State v. Williams*, 2010-Ohio-3667, ¶ 15 (9th Dist.) (continued detention warranted if officer "discovers additional facts from which it is reasonable to infer additional criminal activity"). "Reasonable suspicion requires that an officer be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *State v. Todd*, 2020-Ohio-963, ¶ 8 (9th Dist.), quoting *State v. Davenport*, 2012-Ohio-4427, ¶ 6 (9th Dist.). Reasonable suspicion requires a consideration of the totality of the circumstances. *State v. Panero*, 2018-Ohio-1005, ¶ 18 (9th Dist.). "[N]o single factor is dispositive of whether a law enforcement officer is legally justified in conducting field sobriety tests in any given case." *Hochstetler* at ¶ 12.

**{¶15}** The trial court made each of the following, relevant factual findings. When Sergeant Nemastil decided to stop Mr. Kelly's vehicle for speeding, he activated his overhead lights. Mr. Kelly did not pull over in response to the lights. He continued to drive until the sergeant activated his siren. Mr. Kelly then stopped his vehicle. Sergeant Nemastil approached Mr. Kelly's vehicle on the passenger's side. He informed Mr. Kelly that he had stopped him for speeding, but Mr. Kelly appeared confused. The sergeant explained that he had clocked Mr. Kelly's vehicle going 94 m.p.h. Mr. Kelly repeated that number in a surprised manner. He asked if he was going that fast and apologized.

**{¶16}** Mr. Kelly told Sergeant Nemastil that he and his wife were on their way home from a party at a restaurant. The sergeant detected the smell of alcohol coming from the vehicle, so he asked Mr. Kelly how much he had to drink. Mr. Kelly responded, "not much," and said he was the designated driver. While speaking with him, Sergeant Nemastil observed that Mr. Kelly's eyes were red, bloodshot, and glossy. He noticed Mr. Kelly's speech was slow and he spoke as if his tongue was swollen. When he asked Mr. Kelly for his registration and insurance, the sergeant also noticed Mr. Kelly's movements were slow. His observations led him to continue his investigation.

**{¶17}** Sergeant Nemastil asked Mr. Kelly to exit the vehicle, and Mr. Kelly complied. He left his door open when he exited the car, so the sergeant had to close it for him. The sergeant patted down Mr. Kelly and smelled alcohol on his breath. When he asked Mr. Kelly how much alcohol he had consumed, Mr. Kelly said he had two glasses of wine two hours ago. Based on his observations, Sergeant Nemastil conducted field sobriety testing.

**{¶18}** The trial court found that the totality of the circumstances warranted Mr. Kelly's continued detention. It further found that Sergeant Nemastil had reasonable suspicion to conduct field sobriety testing. The court noted the late hour, Mr. Kelly's excessive speed, the fact that he

made several lane changes at an excessive rate of speed, his confusion about his excessive speed, the fact that he was coming from a party, his admission to drinking alcohol, the appearance of his eyes (i.e., red, bloodshot, and glossy), and his slow speech and movements. The court also noted that bodycam footage showed Mr. Kelly dropping his insurance paperwork before handing it to Sergeant Nemastil. The court found the foregoing circumstances, when viewed collectively, justified further investigation.

{¶19} Mr. Kelly challenges several of the trial court's factual findings as well as its legal conclusion. He once again argues there was no evidence Sergeant Nemastil saw his vehicle speeding rather than another vehicle. To the extent the court found that he made several lane changes, Mr. Kelly argues that finding was incorrect because he only changed lanes once to pass two vehicles. According to Mr. Kelly, he questioned the sergeant about his speed because he did not believe the sergeant, not because he was confused. He argues that his eyes did not appear bloodshot on the bodycam footage, Sergeant Nemastil admitted slow speech and movement might be normal for him (Mr. Kelly), the sergeant did not consider the dropped insurance paperwork to be an indicator of impairment, and the sergeant could not initially say whether the smell of alcohol he detected was coming from Mr. Kelly or his wife. Even if his eyes were red, Mr. Kelly argues that fact, the late hour, and his admission to drinking "not much" alcohol were insufficient indicators of possible impairment to justify his continued detention. Thus, he argues the trial court ought to have granted his motion to suppress.

{¶20} Upon review, Mr. Kelly has not shown that the trial court's factual findings are not supported by competent, credible evidence. *See Burnside*, 2003-Ohio-5372, at ¶ 8. We have already determined that Sergeant Nemastil had reasonable suspicion to stop Mr. Kelly's vehicle for speeding. The dashcam footage showed his vehicle changing lanes to pass two other vehicles

before changing lanes again to return to the center lane. Even if the term "several" would have been a more accurate modifier than the term "multiple" in describing Mr. Kelly's number of lane changes, there was evidence that he changed lanes more than once at a high rate of speed. Regarding Mr. Kelly's slow speech and movements, Sergeant Nemastil testified that he had conducted over 1,000 OVI arrests and that Mr. Kelly's behavior was consistent with impairment. Neither the sergeant, nor the trial court were required to accept the alternative explanation Mr. Kelly offered for his slow speech and movements (i.e., that both might have been normal for him). *See State v. Corn*, 2022-Ohio-3095, ¶ 16 (9th Dist.). Likewise, the trial court was not required to dismiss the fact that Mr. Kelly dropped his insurance paperwork simply because Sergeant Nemastil did not place any weight on it. *See State v. Bowens*, 2014-Ohio-4263, ¶ 10 (9th Dist.) (reasonable suspicion determined under an objective standard). The bodycam footage showed Mr. Kelly dropping his insurance paperwork. While it did not capture the appearance of his eyes in sufficient detail, Sergeant Nemastil testified that they were red, bloodshot, and glossy. The trial court was in the best position to evaluate his credibility. *See Nesbitt*, 2025-Ohio-223, at ¶ 6 (9th Dist.).

**{¶21}** Accepting the trial court's findings as true, we cannot conclude that it erred when it rejected Mr. Kelly's challenge to his continued detention for the purpose of conducting field sobriety testing. *See Burnside* at ¶ 8. Mr. Kelly was speeding at a late hour on a Friday night, was coming from a party, admitted he had consumed alcohol, and had red, bloodshot, and glossy eyes. *See Corn* at ¶ 17. Sergeant Nemastil noted that Mr. Kelly's speech was slow, as if he had a swollen tongue, in addition to his movements. *See State v. Slimmer*, 2023-Ohio-4756, ¶ 12 (9th Dist.) ("[T]his Court has previously listed slow and lethargic movements as an indication of impairment."). He also detected the odor of alcohol coming from inside Mr. Kelly's car and, once Mr. Kelly was outside, smelled it on his breath. *See State v. Ghouche*, 2020-Ohio-3311, ¶ 12 (9th

Dist.). The totality of the circumstances provided him with reasonable suspicion to extend Mr. Kelly's detention and conduct field sobriety testing. *See Panero*, 2018-Ohio-1005, at ¶ 18 (9th Dist.). *Compare State v. High*, 2017-Ohio-8264, ¶ 10-14 (9th Dist.) (reasonable suspicion lacking where officer failed to categorize intensity of alcohol odor he detected, failed to ask follow-up questions about alcohol consumption, and never testified as to any red, glossy, or bloodshot eyes or slurred speech). We reject Mr. Kelly's argument to the contrary. His second assignment of error is overruled.

Arrest

**{¶22}** An officer may arrest an individual if he has probable cause to believe the person is engaging in criminal activity. *State v. McGinty*, 2009-Ohio-994, ¶ 11 (9th Dist.). "An officer has probable cause to arrest an individual for impaired driving if, 'at the time of arrest, the officer had sufficient facts derived from a reasonably trustworthy source to cause a prudent person to believe the suspect was driving under the influence.'" *State v. Spees*, 2018-Ohio-2568, ¶ 30 (9th Dist.), quoting *State v. Hopp*, 2016-Ohio-8027, ¶ 8 (9th Dist.). "This inquiry requires consideration of the totality of the circumstances known to the officer at the time of arrest." *State v. Rogers*, 2017-Ohio-357, ¶ 9 (9th Dist.). An officer may rely on physiological factors as well as the results of any field sobriety tests. *See State v. Gibson*, 2022-Ohio-3862, ¶ 9 (9th Dist.); *Slimmer* at ¶ 31.

**{¶23}** The trial court made each of the following, relevant factual findings. When Sergeant Nemastil administered the horizontal gaze nystagmus test, he recorded six out of six clues. That result created an implication that Mr. Kelly had a prohibited BAC. When the sergeant asked Mr. Kelly if he would take the walk and turn test, Mr. Kelly agreed. The sergeant demonstrated the test and asked Mr. Kelly if he was okay with it. Mr. Kelly responded, "I love

it." During the test, he had trouble balancing, stepped off the imaginary line, and used his arms for balance. At the halfway point of the test, he said he had gout in his right foot. He then said it was his left foot that had gout, but "it's alright." Sergeant Nemastil asked Mr. Kelly if he was going to finish the test, and Mr. Kelly said "yes." His performance yielded seven out of a possible eight clues and created an implication that he had a prohibited BAC. Finally, the sergeant demonstrated the one-leg stand test and asked Mr. Kelly if he was okay with it. Mr. Kelly responded affirmatively. He performed the test before stating, "[t]hat's pretty impressive." His performance yielded three out of four possible clues and created an implication that he had a prohibited BAC. The trial court found that Mr. Kelly never told Sergeant Nemastil he was unable to complete the field sobriety tests due to a medical condition.

{¶24} The trial court concluded that the totality of the circumstances gave rise to probable cause to arrest Mr. Kelly. The circumstances it cited in support of its decision included Mr. Kelly's excessive speed, his confusion as to his speed, the smell of alcohol on his breath, his admission to drinking alcohol, his red, bloodshot, and glossy eyes, his slow speech, his slow movements, the fact that he dropped his insurance paperwork, his failure to close his door when he exited the car, his behavior during the field sobriety tests, and the results of those tests. The court rejected Mr. Kelly's argument that his arrest was invalid.

{¶25} Mr. Kelly has not challenged any of the trial court's individual factual findings. He argues the court erred when it denied his motion to suppress because Sergeant Nemastil lacked sufficient indicia of his impairment. He notes that his driving was not erratic, he had no slurred speech, and he was polite, cooperative, and highly responsive throughout their encounter. According to Mr. Kelly, he did not have bloodshot eyes, and he only admitted that he drank two glasses of wine at an earlier hour. He notes that Sergeant Nemastil never testified about the

strength of the odor of alcohol he detected in the vehicle or on his breath. Moreover, although he did not perform well on the field sobriety tests, Mr. Kelly argues that his poor performance was attributable to his medical condition. He claims the sergeant did not care that he had gout. He denies that the totality of the circumstances supported a finding of probable cause to arrest.

{¶26} Accepting the trial court's findings as true, we cannot conclude that it erred when it rejected Mr. Kelly's challenge to his arrest. *See Burnside*, 2003-Ohio-5372, at ¶ 8. Sergeant Nemastil observed a wealth of psychological factors indicating impairment such as the odor of alcohol, red, bloodshot, and glossy eyes, slow speech, slow movements, and confusion about the reason for the stop. *See Spees*, 2018-Ohio-2568, at ¶ 30 (9th Dist.). Moreover, all three field sobriety tests indicated Mr. Kelly was impaired. *See Slimmer*, 2023-Ohio-4756, at ¶ 31 (9th Dist.). Mr. Kelly has not explained how an issue with his foot would have impacted his performance on the horizontal gaze nystagmus test. Nor has he addressed the positive affirmations and statements he made while performing the other tests. Mr. Kelly repeatedly gave positive responses when Sergeant Nemastil asked if he would take the tests. Though he mentioned his gout, he specifically told the sergeant, "it's alright." Based on the totality of the circumstances, Sergeant Nemastil reasonably could have concluded that Mr. Kelly was driving while impaired. Thus, the trial court did not err when it concluded that his arrest was based on probable cause. Mr. Kelly's third assignment of error is overruled.

III.

{¶27} Mr. Kelly's assignments of error are overruled. The judgment of the Medina Municipal Court is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Medina Municipal Court, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETTY SUTTON
FOR THE COURT

FLAGG LANZINGER, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

DAVID C. SHELDON, Attorney at Law, for Appellant.

GREGORY A. HUBER, Prosecuting Attorney, for Appellee.